**RECEIVED**

AUG 0 3 2015

CLERK U.S. DISTRICT COURT
SOUTHERN DISTRICT OF IOWA

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF IOWA
DAVENPORT DIVISION

| | | |
|---|---|---|
| BRIAN DOE, | ) | |
| JANE & ROBERT DOE, | ) | |
| | ) | |
| Plaintiffs, Pro se | ) | |
| | ) | |
| v. | ) | Case no. |
| | ) | |
| PLEASANT VALLEY SCHOOL DISTRICT | ) | |
| MISSISSIPPI BEND AREA EDUCATION AGENCY | ) | JULY 28, 2015 |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

<u>COMPLAINT</u>

Plaintiffs Brian Doe and his parents, J.D. and R.D. ("Parents") bring this action due to the

harm which resulted from the deprivation of their rights by the Pleasant Valley School District

("PVSD") and Mississippi Bend Area Education Agency ("MBAEA"), Defendants.  Plaintiffs' rights

have been violated under Section 504 of the Rehabilitation Act, as amended ("Section 504")

and Title II of the Americans with Disabilities Act ("ADA").

Section 504 of the Rehabilitation Act of 1973 states that "No otherwise qualified

individual with a disability in the United States, as defined in Sec. 705(20) of this title, shall,

solely by reason of her or his disability, be excluded from participation in, be denied the

1

benefits of, or be subject to discrimination in any program or activity receiving Federal financial assistance. . ." The statute requires that public schools provide a "free appropriate public education" which includes "the provision of regular or special education services and related aids and services that . . . are designed to meet individual educational needs of persons with disabilities as adequately as the needs of persons without disabilities are met . . . (34 C.F.R§104.33(b)(1))". Title II of the Americans with Disabilities Act, (ADA) also provides protection to otherwise qualified individuals with disabilities from exclusion from or denial of the benefits of services, programs or activities by entities which receive federal funds, including local, area and state education agencies. As a consequence of being denied these rights by the PVSD and MBAEA, Brian suffered severe and irreparable harm, which has limited his educational and psychological functioning since that time.

## JURISDICTION AND VENUE

Plaintiffs bring this action under Section 504 of the Rehabilitation Act of 1973, as amended, 29, U.S.C. § 794 ("Section 504") and Title II of the Americans with Disabilities Act, 42 U.S.C. §12131 *et seq.* ("ADA"). The Court has jurisdiction pursuant to statutes including 28 U.S.C. §1331, which gives district courts original jurisdiction over civil actions arising under the Constitution, laws or treaties of the United States; and 28 U.S.C.§1343 (3) and (4) which give district courts jurisdiction over actions to address civil rights extended by the United States government. Venue is appropriate in this judicial district under U.S.C. §1391(b) because the events that gave rise to this Complaint occurred in this district.

2

## INTRODUCTORY STATEMENT

### 1.

Brian is an intellectually gifted student with a unique constellation of disabilities and strengths. He was found eligible for a Section 504 plan in the third grade. While he was also found eligible for special education services in March of his freshman year at Pleasant Valley High School (PVHS), his eligibility under Section 504 and the ADA remained. Even among twice-exceptional students, those intellectually gifted students also handicapped by specific learning disabilities and/or health impairments, Brian's profile was deemed "extraordinarily rare."[1] That profile includes a nonverbal learning disability, attention deficit disorder, dysgraphia and a processing speed deficit which resulted in him needing significantly more time than his nondisabled peers to produce written work.

### 2.

Brian's comprehension ability, however, is in the superior range of intellectual ability—in the top one percent of his age peers. Based on the specific nature of his disabilities, a report from University of Iowa Hospitals & Clinics—authored by a national expert in twice-exceptional education—indicated that it was essential for Brian to have reduced assignments and untimed testing. This evaluation report was provided to PVSD prior to Brian's enrollment in the district.

### 3.

As described in his Individual Education Plan (IEP) at PVHS, Brian is "a very kind and polite young man, conscientious and extremely driven to meet his goals, strives to reach perfection on all academic tasks, easily accepts feedback from adults, has an extensive

---

[1] University of Iowa, Belin-Blank Center for Gifted Education, 2007 Evaluation Report, authored by Dr. Megan Foley-Nicpon.

vocabulary and creative ideas, extremely easy-going, accepted by his peers, and works well in groups." Yet PVHS consistently failed to implement essential supports and services to enable Brian to benefit from his education. In the absence of *any* behavior problems, Brian was excluded from participation with his general education peers for extended periods of time, as much as 47 percent of the school day. This type of exclusion, by itself, denies access to an appropriate education—unless is it necessary to meet the student's educational needs.

### 4.

Despite guidance from the Office of Civil Rights "to ensure that placement decisions for all students are based on each student's individual academic abilities, regardless of the presence, nature, or severity of a disability",[2] PVSD has a pattern of limiting or denying access to honors and AP classes to students with disabilities. Where such a pattern of discrimination exists, it effects the attitudes of teachers regarding the rights of otherwise qualified students with disabilities to receive accommodations in honors classes. This pattern of discrimination, perpetuated by the MBAEA, had a significant impact on Brian.

### 5.

Despite his unique disabilities, Brian worked hard in order to be successful in a variety of college preparatory and honors level classes at PVHS. In his freshman year, Brian earned all A's and B's, including in honors English. However, when he was repeatedly denied the accommodations required to level the playing field for his disabilities, he suffered serious declines in both his academic and psychological functioning. The impact on his self-esteem was profound.

---

[2] United States Department of Education, Office for Civil Rights "Dear Colleague letter" dated December 26, 2007.

HISTORY

6.

SCHOOL YEAR 2010—2011

From the start, PVSD administrators were well aware of Brian's disabilities.  The Section 504 plan which had facilitated his success in middle school was shared with PVHS, and included the key accommodations of untimed tests and reduced assignments.  When Brian's 504 plan was altered by PVHS administrators to limit testing time to twice the standard time, he began to fail.  When this was brought to his attention by parents, Principal Zimmer revised the plan.  Since in his "worst case scenario" (math) Brian might need four times the standard time, that was the time limit in the new 504 plan.

7.

As a condition of getting this extra time during the school day for test completion, Brian agreed to drop one core class, with Zimmer's assurance that he would still be able to graduate with his class.  Brian successfully completed the semester, earning A's and B's.  He was able to complete approximately 95% of his homework.  However, no assignment reductions were offered, and parents expressed their concern that it was not sustainable for Brian to be spending upwards of 30 hours a week on homework—in addition to the time he spent in school.  Assignment reductions were a key piece of any educational plan which would allow Brian to sustain his energy and enthusiasm for school

8.

Following each semester without appropriate supports and services, parents and staff noticed more impairment in Brian's school functioning, including increasing difficulty with

5

processing speed, attention and executive functioning.  When the IEP team met in March and

April 2011, this was a critical concern: Brian could not continue to spend so many hours on

school work because the overload appeared to be quite detrimental, exacerbating his already

significant disabilities.  The evaluation by the MBAEA concurred with that from the University of

Iowa—Brian needed "significantly reduced assignments in order to receive educational

benefit,"[3] as well as alternate forms of assessment and untimed tests.

9.

The IEP stated that "the goal for [Brian], in light of his post-secondary goal of attending a

competitive four year college, will be to decrease his accommodations over time. . . . [his]

specially designed instruction will need to be monitored and intensified as necessary *in order to

reduce his need for* accommodations and modifications which will not be provided at the post-

secondary level."[4]  Brian enjoyed the depth and complexity of the honors curriculum and

produced high quality work.  He made the decision to continue with the honors English track

for sophomore year.  His IEP explicitly gave Brian a role in determining what constituted a

"reasonable workload" for him, and ensured that assignments would be reduced to that end.

10.

Despite the agreement of the IEP team to provide needed supports and services, there

was dissention from the school psychologist—and perhaps others, following Brian's decision to

continue in the honors English track.  Brian's IEP was altered more than once outside of an IEP

team meeting.  These alterations reduced or removed accommodations, such that no floor of

---

[3] Educational Evaluation Report, 2011, by the Mississippi Bend Area Education Agency
[4] From the initial IEP dated March 29, 2011, in the section entitled "Other information essential for the development of this IEP", emphasis added.

6

opportunity remained.  Although most of the agreed upon supports and services were finally

restored, the dissention of some IEP team members festered.  Unaware of this, Brian was

hopeful that with his continued hard work, the agreed upon plan would finally allow him a

reasonably normal experience of high school.

11.

SCHOOL YEAR 2011-2012

However, right from the start of his third semester, Brian's teachers appeared unwilling

to make key IEP accommodations.  (Email communication between teachers documents that

this was indeed the case.)  Although the "reasonableness" standard does not apply until the

post-secondary level, the nature of the accommodations Brian needed at this time were, in

fact, reasonable ones.  Brian and his parents were clear that he wasn't seeking a reduced

intellectual challenge—just accommodations to level the playing field for his disabilities.

12.

Early in his third semester, Brian's special education teacher removed him from general

education for 47% of the school day—not for instruction, but for test completion.  For most of

this time, Brian was working to complete quizzes for Spanish II.  Parents requested the

"alternate form of assessment" accommodation which had been used successfully by the

Spanish I teacher—oral quizzes.  PVSD denied that accommodation.  Rather than provide

alternate forms of assessment—as per his IEP—PVSD denied Brian access to instruction with his

general education peers.  Still, his test completion extended into the evening hours, with Brian

working near the principal's office until 9 or 10 in the evening.  When he was finished there, he

still had homework to worry about.

13.

Brian did have one period designated for specially designed instruction in writing fluency. But the instruction was never delivered as designed, and failed to provide any benefit—instead, Brian's performance declined. Both special education teachers responsible for delivering this instruction testified in due process that it was not effective. Contrary to standard and accepted practice in the State of Iowa, they never called an IEP meeting to address this problem.

14.

The lack of effective instruction in his goal area may explain why Brian made no progress in writing fluency. But it would be hard to attribute the sharp decline in his overall functioning to ineffective instruction alone. Dr. Valerie Cool, an independent evaluator chosen by the MBAEA, would later testify at due process that there were problems in the environment in which the specially designed instruction was delivered. A large body of research attests to the fact that teachers' attitudes and expectations toward their students is an extremely powerful factor in their learning progress or lack thereof. Brian stated that he did not feel at all supported by his special education teachers—because it was made clear to him that they didn't believe he should have his IEP accommodations if he was enrolled in honors English. When he perceived that message communicated to him relentlessly, he became demoralized—the relief promised by the IEP team never materialized.

15.

Since the IEP was not being implemented as written—and that was hurting their son-- parents filed two requests for mediation, and finally went to due process. Throughout, parents

tried to work collaboratively with the district.  At a meeting deemed a "review of the current

IEP," parents shared their concern that Brian was overwhelmed by an unreduced homework

load.  The denial of agreed upon accommodations was causing him great anxiety.  They shared

their concern that the impact of Brian's processing speed was now greater.  PVHS teachers

agreed—his work completion time was, in fact, now *even more discrepant* from his peers.

Previously only math assessments took Brian as long as four times the standard time.  Now,

teachers reported that he was unable to complete any tests or quizzes within this timeframe—

not even close.  This decline in educational functioning was alarming to parents.

16.

Following that meeting, and without prior notice to parents, PVSD amended Brian's IEP

to limit his assessment time to four times the standard time—*exactly what they had just*

*informed parents that Brian was no longer able to do*.  However, now that he was failing core

classes, PVSD finally made their first proactive assignment reductions, in November 2011.  Any

relief this could have offered was undermined by the fact that Brian was still held responsible

for previous assignments.  This amended IEP, dated November 3, 2011, officially removed any

floor of opportunity from Brian's IEP.

17.

The longer Brain went without needed supports and services, the more his functioning

became impaired.  The decline in his goal area of writing fluency was apparent.  Brian had

produced over 100 pages of written work for Honors English 9, judged by his teacher to be of

high quality.  He was unable to produce *any* written work for Honors English 10 in his final

semester, according to teacher report and testimony.  Brian's verbally fluency also became

9

impaired.  This previously articulate young man could now only painstakingly write or even

speak.  As Principal Zimmer would report, Brian's verbal fluency became so impaired it was

painful to observe him try to speak.

18.

Although Brian continued to work hard in his classes, his endurance was taxed.  His

teachers noted that he had more difficulty with inattention compared to his freshman year.

Brian's capacity to sustain attention and work independently—which had increased during his

middle school years--now deteriorated to a level never seen before. As a result, parents began

to work with Brian for virtually 100% of the time he spent on homework.  Working with him

one-to-one, parents were able to log the hours Brian spent on homework during that third

semester.  He spent an average of 24.5 hours on homework per week, with a range of 14.75

hours when he was sick to over 40 hours at the end of the semester.  Parents shared their

concern and finally their alarm that Brian was becoming increasingly demoralized, anxious and

depressed about school.  However, nothing parents said about their son's needs had any

impact on the district's course of action.

19.

One special education teacher noted that Brian began to exhibit behavior indicative of

extreme emotionally distress in her classroom.  She shared this concern with Brian's special

education case manager.  Neither teacher shared anything about the decline in his

psychological functioning with Brian's parents.  Instead, when parents expressed their concern

about Brian's increasing anxiety and depression, his special education teachers were dismissive,

concealing their own observations and knowledge to the contrary.  Brian was highly cognizant

10

of the decline in his educational functioning.  He would later share with his mother that it made

him so despondent he began to experience suicidal thoughts.  Brian didn't miss the fact that his

performance, across a range of domains, was becoming more and more discrepant from his

peers.  Even after leaving the PVSD, this discrepancy continued to be very troubling to Brian,

who was well aware when his classmates graduated, and then finished their first year of

college.

20.

Brian continued to stay late at school and spent the first days of winter break

completing his final exams.  After all his third semester final exams were complete, his special

education case manager informed parents that she expected Brian to spend more time over

break in the principal's office area to complete work from earlier in the semester.  This was a

turning point for parents--their goal now became to protect Brian from further decline.  Parents

decided it was more important for Brian to spend some relaxed time with his family, and did

not inform him that his special education teachers expected him to keep working over the

holiday.

21.

Brian started his fourth semester by being told—in no uncertain terms—that he needed

to complete assignments, tests and quizzes from the third semester, or he would receive failing

grades and be removed from the Honors English class.  Despite parents' objection to a plan that

clearly set their son up for failure, PVSD insisted that Brian continue to work on the previous

semester's assignments.  As would be apparent to any educator, if a student takes significantly

longer than other students to produce written work, then carrying work over from one

11

semester to the next is an unworkable proposition.  For a student "driven to meet his goals", as

PVHS staff aptly described him, this was a recipe not only for educational failure, but for

psychological disintegration.

22.

By now, Brian could barely get out of bed in the morning, so painful was his experience

of school.  PVHS treated his lateness as a disciplinary issue.  All parents could do was to ask

their son to please continue to attend school, do his best to learn, and not worry about the

assignments that he was by now unable to complete.  They continued to alternate working with

him one-to-one at home to help him sustain attention and complete the homework he could,

but also encouraged Brian to give himself some breaks.  Parents' attempt to reduce their son's

high level of anxiety in relation to school was effectively misconstrued by Defendants' legal

counsel, who advanced the theory that Brian's failure in his fourth semester was his own fault

for not doing the work—or alternatively, parents' fault, for allegedly telling him not to do it.

23.

Brian's effective processing speed continued to deteriorate.  His special education

teacher stated that Brian was now unable to write a paragraph, given 20 class periods and her

one-to-one support.  PVSD wrote a new IEP to further limit his Brian's assessment time to three

times the standard time, reasoning that that they needed to "help" him prepare for college.

Parents continued to express their concern that Brian was deteriorating educationally and

emotionally.  But his special education case manager repeatedly overrode and dismissed

parents' concerns, with the observation that he had a smile on his face when interacting with

his friends.

12

24.

With his characteristic determination, Brian continued to do his best to meet the
impossible demands placed upon him, for the duration of the semester.  He spend a great deal
of time on a major project for honors English 10, on which he earned an A.  However, he still
failed that class, as well as Spanish II.  His final grade in honors Biology was a passing one, albeit
barely.

25.

INDEPENDENT EDUCATIONAL EVALUATION 2012

In April 2011, Brian received an Independent Educational Evaluation at the University of
Iowa, Hospitals & Clinics.  The results were substantially similar to the two previous evaluations.
The assessment report stated that timed tests were *not* appropriate for Brian, and that a
reduced workload, based on his individual needs, was essential.  The evaluators commented on
his very strong work ethic, high verbal comprehension ability and profoundly slow processing
speed.  These same evaluators, chosen by the MBAEA, also testified that it was indeed possible
to serve students like Brian in honors classes—but only if teachers were willing to make the
appropriate accommodations.

26.

SCHOOL YEAR 2012-2013:  START OF THE PRIVATE SCHOOL PLACEMENT

After four semesters of decline, parents gave notice to the PVSD of their intent to enroll
Brian in a private school program which could provide appropriate supports and services for his
unique disabilities.  A mediation was held with PVSD on August 3, 2012.  Parents cancelled their
due process scheduled for August 6, and moved forward with this placement, in the belief that

they had reached an agreement with the PVSD and MBAEA. Zimmer had two phone conferences with the principal of the ATG Academy in Warminster, PA, an accredited private school for students with learning disabilities. Zimmer contacted parents for permission to send Brian's records. When parents learned, late in August, that they had no legally binding agreement with PVSD and MBAEA, they made the decision to go forward with this unilateral placement at the ATG Academy. Although this placement allowed Brian to again experience academic success, his psychological recovery was more difficult. Brian was cognizant of his deficits, and remained depressed about his diminished functioning and prospects for the future. His speech fluency slowly returned.

27.

JANUARY 2013—THE DUE PROCESS HEARING

The decline in Brian's educational functioning was undisputed by either party. Through the skill of their attorney, the defendants deflected responsibility for that decline onto Brian and his parents. Counsel for the district and MBAEA used Brian's his good final grades in semester 3 as evidence that the district provided an appropriate program. The ALJ, with all due respect, did not seem to realize that Brian would not have earned those passing grades if he hadn't continued working on 3rd semester material during the 4th semester. Or that the continuation of that work into the following semester predictably and inevitably resulted in his failure. Key facts of the case were obscured by false and misleading testimony, given under oath at the hearing. (Although the Plaintiff's then attorney was not sufficiently organized to present that evidence, the Plaintiffs are now prepared to do so.) The PVSD and MBAEA

14

prevailed in the judgement of the ALJ in late April 2013.  Parents filed an appeal of that decision in this Court, which is pending.

28.

After receiving the ALJ's decision, PVSD wrote a new IEP for Brian.  When MBAEA social worker, Mollie Conrad, contacted JD to attend an IEP meeting to discuss a new plan for Brian—incorporating the results of the 2012 Independent Evaluation, she agreed.  Financial pressure was also mounting—parents had been unable to send their daughter back for her junior year of college, and were draining their retirement to fund Brian's attendance at ATG.  Finally, JD, who had moved to Pennsylvania so that Brian could attend ATG, hoped to live with her husband again.

29.

JULY 30, 2013 IEP MEETING AT PLEASANT VALLEY HIGH SCHOOL

Parents were solely disappointed that this new IEP failed to incorporate the essential supports and services described in the 2012 evaluation.  Again, PVSD offered an IEP which denied Brian the individualized accommodations necessary to provide him any floor of opportunity for success.  His testing accommodations were limited to twice the standard time, a standard that had repeatedly ensured his failure.  It was at this meeting that Zimmer's underlying assumptions transpired— if Brian wanted to have accommodations for the general education curriculum at his ability level, then he would need to spend more time in high school.  Given the decline in Brian's functioning, honors classes were already off the table.  Now, PVSD wanted Brian to extend his time in high school—and receive a modified curriculum.  (A modified curriculum is typically offered to students with intellectual disabilities.)  Although the

15

district later revised the IEP to remove the "modified curriculum" wording, parents had learned through bitter experience that what the IEP actually said meant nothing when it came to their son's education. Their belief that a modified curriculum was needed for this intellectually gifted student demonstrated two things to parents-- that PVSD had failed to grasp (or chosen to ignore) the essence of the 2012 Independent Educational Evaluation—and that there was *no* possibility that PVSD would meet their son's educational needs.

30.

SCHOOL YEAR 2013-2014—THE PRIVATE PLACEMENT CONTINUES

Still, parents could not afford a program which met all of their son's needs. To alleviate his depression, JD arranged for Brian to participate in Concert Choir in the local public school district in September 2013. The resident district accommodated him in this so that he could regain access to participation in with his general education peers. He continued to be enrolled full-time at the ATG Academy, and continued to make progress academically and in terms of his disability areas.

31.

AUGUST 2014 EVALUATION

After two years of the specialized program of instruction offered at ATG, Brian showed a highly significant improvement in his Processing Speed Index, as measured on the Wechsler Scale of Intelligence. Like all IQ Index Scores, the Processing Speed Index is understood to be a fairly stable construct, with little variation from one test administration to another. Brian's previous scores had been at the 9th and 11th percentiles. He now scored at the 30th percentile. This is a highly unusual gain, roughly equivalent to an adult growing six inches taller. This was

conducted by the resident public school district in PA—an entity with absolutely no motivation to demonstrate the effectiveness of Brian's private school program.

32.

SCHOOL YEAR 2013-2014—PRIVATE AND PUBLIC SCHOOL PLACEMENT

As he improved academically, Brian and his parents felt it was important to increase his time spent with his general education peers, and planned for Brian to take an academic class, in addition to Choir, at the local public school, while he continued to receive specially designed instruction at ATG.  Pennsylvania recognizes gifted LD students, and Brian was identified as such.  Once his teachers understood his unique profile, Brian was able to be successful in academic classes as well as in choir.

33.

Unfortunately, a proposal by the local public school district—that Brian continue in high school for two more years—was followed by a rapid emotional deterioration.  This was essentially the same plan reiterated to Brian and his parents by Principal Zimmer at PVHS—a plan that was, each time, devastating to his self-esteem.  Brian first experienced suicidal ideation in response to the declines in his functioning at PVHS.  Now those feelings resurfaced, and he again became a danger to himself.  The symptoms of psychological disorganization which first appeared in the presence of the PVHS special education teacher resurfaced as well.  Brian was hospitalized for about two months, from February—April 2015.  Consultation with his therapist indicates that Brian's psychological system was fractured by his experience in the PVSD; then, when a new stressor revived those painful issues, he fell apart.

SUMMARY

34.

Each semester Brian attended the PVSD, he suffered a decline in functioning, until parents removed him from the district.  From the time Brian made the decision to remain in the honors track English, PVSD staff made it impossible for him to succeed, because of his disability. This was done despite the demonstrated high quality—*and quantity*--of work he produced in honors English 9.   Through their actions, the PVSD created a de facto denial of access to the honors curriculum, to a student otherwise qualified to benefit from that curriculum.  In so doing, they triggered a downward spiral in Brian's educational and psychological functioning. Parents repeatedly tried to sound the alarm, to no avail.

35.

In his final semester, PVSD staff estimated that Brian could by now only complete about one-third of his work, a sharp decline from the 95% level at which he began.  Instead of taking two to four times longer to complete assignments and assessments, by the end, Brian's could no longer complete a paragraph, even given 20 class periods.  In honors English 9, he produced over 100 pages of written work, judged by his teacher to be of high quality.  By his final semester in the district, Brian was unable to produce *any* written work for honors English 10. With evidence of such a stunning decline, why was no one on the IEP team asking what was going wrong?

36.

Brian had always been a hardworking and successful student.  But—regardless of the level of the curriculum—he could only be successful if his teachers were willing to provide the

18

accommodations he needed to level the playing field for his disabilities.  Following his initial

IEP—which was never implemented with integrity—Brian's three subsequent IEPs removed any

floor of opportunity for his success.  None of these IEPs were reasonably calculated to allow

him to achieve passing marks or to advance from grade to grade, as required by law.  Despite

his strong ability and work ethic, Brian was denied even a fighting chance of success.

37.

To say that Brian's educational needs were not met as adequately as those of

nondisabled students would be to grossly understate the harm that resulted from the actions of

the PVSD and MBAEA.  This case is not about a lack of meaningful educational progress—

although there was none, after Brian's first semester.  It is not even about a student who

regressed.  This is about a student who was allowed to deteriorate to the point that he became

educationally and emotionally dysfunctional.  Parents' exclusion from *meaningful* participation

in the IEP team allowed this to happen.

38.

Schools are required to meet the needs of students with disabilities as adequately as

they meet the needs of nondisabled students.  If a district fails to provide an appropriate

education, that district is responsible for compensatory education which is "reasonably

calculated to provide the educational benefits that likely would have accrued from special

education services the school district should have supplied in the first place."[5]

---

[5] Reid v. District of Columbia, 2005.

39.

Brian's experience in the PVSD left permanent emotional scars, and created significant new psychological challenges. Although the provision of effective specially designed instruction at the private school has remediated much of the academic decline, it has not addressed any of the psychological needs which resulted from his profound experience of failure at PVHS. Brian is now 19 years old, but his overall functioning is still well below the baseline with which he entered PVHS. Brian needs effective specially designed instruction to continue to remediate the decline in his goal area. To gain educational benefit, Brian now needs a comprehensive therapeutic educational program, including monitoring of his stress level and psychological safety, as in integral component of the program.

40.

Even compensatory education, though, cannot make up for the severe emotional pain and injury Brian suffered—and which continue to limit his capacity to function in the adult world of living, learning, and working. Brian has forever lost the educational opportunity he should have received at PVHS. He was denied the opportunity to learn with his nondisabled peers, to develop his skills and talents during his high school years, and to have a developmentally appropriate experience of high school. As a direct and proximate result of the defendants' unlawful discrimination, Brian and his family have suffered multiple losses, injuries and damages.

PRAYER FOR RELIEF

The Plaintiffs pray that this Court will enter judgement against the Defendants, the PVSD and the MBAEA, providing the following relief:

20

(a) Reimbursement for all compensatory educational and related costs incurred by parents, unless such reimbursement might duplicate any award in the related case pending before this Court, filed under the Individuals with Disabilities Education Act.

(b) Compensatory education sufficient to place Brian in the position he should have achieved, had there been no violation of his rights.

(c) An order restraining the Defendants from further such acts of discrimination and retaliation.

(d) An award of damages to Brian for pain and suffering, loss of educational opportunity, and future earnings.

(e) Reimbursement for all co-payments for Brian's psychological services, since January 2012, when his therapist gave written notice to the district of her concern about the detrimental psychological effects of Gavin's educational experience at PVHS.

(f) An award of damages to parents for the denial of their right to *meaningful* participation in their son's education, and for JD's loss of wages, which occurred as a consequence of the PVSD and MBAEA's actions toward her son, unless such compensation duplicates any that might be awarded in the Jane Doe v. MBAEA case filed in this Court.

(g) An award of damages to the parents for their loss of opportunity to live together as a married couple.

(h) An award of interests, costs, and reasonable attorneys' fees, if applicable.

(i) Such other and further relief as this Court deems appropriate.

Respectfully submitted,

Brian Doe
Jane & Robert Doe